THE WILLIAMS LAW GROUP
Andrew Williams, Esq.
Attorney for Plaintiff
6273 Sunset Drive
Suite D3
South Miami, Florida 33143
Telephone: (253) 970-1683
CA Bar No. 310526
Email:  Andrew@TheWilliamsLG.com
Secondary Email: WilliamsLawFlorida@gmail.com

**Attorney for Plaintiffs, SHAYLA FITE and THE FITE BRAND, LLC**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAYLA FITE, an individual; and THE FITE BRAND, LLC, a California Limited Liability Company<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL BEASLEY, JR., an individual;<br><br>Defendant | Case No.: 2:21-cv-3908-FMO (JPRx)<br><br>**DECLARATION OF SHAYLA FITE IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT** |

I, SHAYLA FITE the undersigned affiant, state the following under oath:

1. I am over the age of eighteen (18) and I am capable of making this declaration.

2. I am one of the Plaintiffs in the above-captioned matter.

3. I am also the sole owner/principal and member of The Fite Brand, LLC, and have been so at all times material hereto.

4. I am fully familiar with the facts set forth herein, and if called upon as a witness, could testify competently thereto.

5.  I first met the Defendant whom I knew as Michael, (the "Defendant") in July of 2018.

6.  When I received a call from the Defendant's then agent, Derrick Powell, advising that the Defendant wanted to meet with me for my professional services it was one of the happiest days of my life as the Defendant was set to be my first client after I transitioned my business from a fashion stylist to a personal brand and development manager for professional athletes (the Defendant is a professional basketball player).

7.  During the initial meeting with the Defendant, he expressed to me that he was seeking someone who could perform the services of both a personal assistant and a brand manager.

8.  We discussed my services, his goals, his potential for growth and the areas in which he felt his brand needed work.

9.  At the end of this meeting with the Defendant, I advised him that I was interested in the opportunity, but I also expressed that I had plans to move to Paris, France in September of 2018, and I would proceed with my move in the event I did not receive a timely offer from him or his agent.

10. The Defendant and his agent indicated that they understood this and advised me that they would respond to me promptly concerning the Defendant's decision.

11. After unsuccessfully attempting to reach the Defendant and his agent regarding the status of the offer, I moved to Paris in order to expand my career opportunities in the branding industry. A true and correct copy of my flight itinerary to Paris has been attached hereto as Exhibit "**A**".

12. While I was in Paris, I received a call from the Defendant's agent, Derrick Powell, who requested that I return to the United States (the "U.S.") from France because the Defendant desired to retain my services.

13. After this phone call, we spent the next several days discussing and negotiating my services, duties, and fees.

14.     Once we completed the negotiations for my services, I flew back to the U.S to begin providing my branding services for the Defendant. A true and correct copy of my flight itinerary for my return to the U.S. has been attached hereto as Exhibit "**B**".

15. A true and correct copy of my agreement with the Defendant for my professional services has also been included with this Declaration as Exhibit "**C**".

16. The Defendant informed me that one of the reasons he hired me was because, according to him, I 'reminded him of a sister' and I was someone with authority who could help guide him in the right direction and successfully grow his brand.

17.     I took these comments to heart and made it a point to exceed his expectations of me.

18.     These comments from the Defendant were echoed by his agent who advised me that the Defendant hired me to turn his brand around as he had developed a reputation as a "problem child" in the sports industry.

19. When I began working with the Defendant, he requested that I arrive at his home at 10:00 am.

20.     Oftentimes, I would not be permitted to leave or end my duties until after midnight.

21.     I was advised by the Defendant's agent that the purpose of this was for the Defendant to get to know and trust me.

22.     I informed the Defendant that I felt it would be a good idea for him to get a custom suit in order to help change his image.

23.     The Defendant agreed to getting the suit and I connected him with an associate of mine who was a designer, Gary Jones ("Mr. Jones").

24.     Due to my relationship with Mr. Jones, he agreed to create the suit for the Defendant for free.

25.     In addition to working with the Defendant to change his image, I also established a

---

product endorsement deal with the brand Solbiato DC ("Solbiato") in which Solbiato agreed to pay the Defendant a minimum of $10,000.00 per month to wear and post about their products online and via social media.

26. This deal would have lasted at least one (1) year, and I would have been entitled to a twenty (20%) percent commission pursuant to our agreement, or $24,000.00.

27. Solbiato confirmed their acceptance of the endorsement deal on October 29, 2018, but requested that I connect them with the Defendant to confirm our working relationship before they moved forward. A true and correct copy of the email confirmation of the deal with Solbiato is attached hereto as Exhibit "**D**".

28. Unfortunately, the events that led to the filing of this action took place before the Solbiato deal was fully consummated and as a further result of the Defendant's actions I was deprived of my $24,000.00 commission.

29. Despite the fact that my contract provided for my entire Twelve Thousand ($12,000.00) dollar fee (the "Fee") to be paid in advance of my services, to this date I have only received a payment of One Thousand ($1,000.00) dollars from the Defendant.

30. I sent emails with my invoices to both the Defendant and the Defendant's accountant, yet I still never received my payment of the Fee that was due.

31. Initially, I continued to work for the Defendant because I received assurances from him that he would introduce me to several of his teammates with the Los Angeles Lakers such as LeBron James, Rajon Rondo and Lance Stepheson.

32. The opportunity to turn my first professional athlete client in to four and to potentially acquire

LeBron James as a client induced me to stay, however, notwithstanding these representations from the Defendant the environment was ultimately too hostile for my liking and I decided to part ways with the Defendant.

33. Shortly after I stopped performing services on the Defendant's behalf, I received the suit that had been created for the Defendant by Mr. Jones in the mail.

34.     Upon receiving the suit, I called the Defendant and informed him that I would deliver the suit to him and asked if he would provide me with the unpaid balance of the Fee that was owed for my services pursuant to our agreement.

35.     The Defendant agreed.

36.     When I arrived at the Defendant's home, I had the suit in hand and expected to exchange the suit with him for payment of the Fee.

37.     The Defendant indicated that he wished to speak with me and asked me to follow him upstairs where we could speak privately.

38. The Defendant walked upstairs to his room and I followed him with the suit in hand.

39.     Once in the Defendant's room, I realized that he had closed the door behind us.

40.     This made me uneasy, but I was not sure what to think as we had talked in his room, or in private several times, but he had *never* previously closed the door during these private discussions.

41. I did not mention the closed door to the Defendant, who began asking me about the suit.

42.     I informed him that Mr. Jones had created the suit based upon the measurements that the Defendant provided me and that the Defendant should not have any issues with the suit, but that he may need to see a seamstress.

43.     I advised the Defendant that I would take the suit out of the bag so that he could try it on, to which the Defendant acknowledged.

44. I got on my knees to unzip the bag that contained the suit and I placed it down for the Defendant to view.

45.     When I began to turn around to assess the Defendant's approval of the suit, I saw that the Defendant had emerged from his closet, removed his clothes and he was standing over me with a fully erect penis that was close to my face.

46.     I was in utter shock in this moment and I therefore averted my eyes.

47.     I told the Defendant that 'I [was] going to close my eyes' so that he 'could put [his] clothes back on' and I began to cover my face with my hands.

48. In response to this comment, the Defendant advised me that I did not need to close my eyes.

49.     After he said this, I began to stand up, and I again asked the Defendant to put his clothes on a second time.

50.     I had never been in such a situation in my life and I did not know what to do, so I called Mr. Jones, the designer on FaceTime.

51. As I was on the phone with Mr. Jones, the Defendant emerged from his closet, this time wearing the suit; however, his penis was still clearly erect.

52. Mr. Jones was able to see how the suit looked on the Defendant and he was also able to notice the Defendant's erection.

53. After I enabled Mr. Jones to observe the Defendant in the suit, I eventually concluded my call with him.

54.     I intend to call Mr. Jones as a witness at the hearing on my motion to corroborate these events.

55.     When my call with Mr. Jones concluded, I felt as if my feet were cemented to the ground and that I could not move. I was paralyzed in shock and fear with what had just transpired.

56. Eventually, the Defendant re-emerged from his closet in a new outfit and the Defendant and I stared at each in other in silence for approximately five (5) very long seconds.

57.     I informed the Defendant that I intended to leave, at which point he jumped in front of me and beat me to his bedroom door.

58.     The Defendant demanded that I text him the address of an event that I was having before I could leave.

59.     I sent him the address, and he proceeded to follow behind me as I exited his front door, fighting back tears.

60. When I heard the door shut behind me, I ran to my car and tried to process what happened.

61.     After I drove from the Defendant's residence I called my mother, Stephanie Fite, and broke down and explained to her what happened to me.

62. I intend to call my mother as a witness at a hearing on this Motion.  She will be coming from Houston, Texas and taking off work in order to testify on my behalf at the hearing on this motion.

63. After the incident with the Defendant at his residence, I thought to myself "how could this happen to me. Not me; not Shayla."

64.     As a woman, I have heard stories of other women who had been raped, touched even harassed, but I always used to think to myself, *before this incident*, that "she should have done this", "why did she do that", "that would not be me because I would do this;" however, after finding myself in such a situation I realized how flawed my past thinking was.

65.     When I was placed in that situation, a million things went through my head.  On the one hand, I was trying to be professional, do my job, and receive the payment that I was owed, on the other, I was terrified, embarrassed and mad.

66.     I did not plan to be in that situation and I realized upon being in it that there is no rule

book for those who are victimized.

67. After the situation, I blamed myself for going over to the Defendant's residence, but after engaging in therapy sessions I have come to realize this was *not* my fault!

68.    I did nothing wrong, and I did not ask for the Defendant to present his naked body in front of me or to shut the door behind us.

69. After the incident with the Defendant, I initially gave up my business, The Fite Brand, and decided that I no longer wanted to work with another athlete again.

70.    Since approximately 2008 it had been my dream to work with NBA athletes and since I was seven (7) years old it had been my plan to own my own business.

71.    I was blessed to have the opportunity to do both, or so I thought.

72.    I became suicidal, depressed and fearful of men after my encounter with the Defendant.

73.    I eventually moved back home to Columbus, Ohio to avoid running into the Defendant after I became homeless due to the Defendant's failure to pay the Fee as agreed.

74.    I was homeless and living in my car for approximately six (6) months after the incident with the Defendant.

75. During this time, I applied for and worked various jobs, including temporary jobs doing styling and as an Uber driver. A true and correct copy of evidence of these job applications and my time spent as an Uber driver has been attached hereto as Composite Exhibit "**E**" and Composite Exhibit "**F**".

76.    A friend of mine, Genesis Sandavol ("Ms. Sandavol"), discovered that I was living in my car and she and her family allowed me to stay in her family's home for approximately three (3) months.

77.    I went to Columbus, Ohio after I left Ms. Sandavol's home.

78.    I intend to call Ms. Sandavol as a witness at the hearing on this Motion.

79.    I also deleted my social media accounts, so that I would not risk having the Defendant's

name or image come across my way, not even inadvertently.

80.     I contemplated taking my life nearly every day until I started going to therapy with Athena Jackson ("Ms. Jackson").

81. I stayed in Columbus for approximately 14 months and treated with Ms. Jackson via virtual and telephonic sessions.

82.     Each session costs $60; however, Ms. Jackson, who saw my need for her services agreed that we could do a services exchange in which I would help her with the development of her brand in exchange for her therapy services.

83.     I still nonetheless paid significant sums to Ms. Jackson; however, I am awaiting a complete copy of my records and bills from her and cannot confirm the exact amount at this time.

84.     I anticipate that I will have those records and bills in advance of my hearing and my attorney has advised me that we can file those with this Court under seal.

85. After regaining my "strength" with Ms. Jackson's help, I eventually decided in January 2021 that I would give my company and the sports industry another try.  I, however, have restructured my business model in which I have created a course that athletes can take and use to assist them with their brands and brand development.

86.     The sole reason for me restructuring my business model in this way was due to my encounter with the Defendant and while I may have regained my "strength" I do not feel comfortable, nor do I wish to engage in any personal relationships with athletes or to be alone with any athlete.

87.     It has yet to be seen how this modification will impact my future business.

88.     I now feel like meeting the Defendant was one of the worst days of my life and it caused my life to spiral downward for nearly three (3) years and I still suffer from the residual effects.

89. I wish to have a hearing in order to voice my views and how this incident with the Defendant

has impacted me.

90.     It has been explained to me that a hearing is at this Court's discretion but I implore this Court to allow me to formally address it as I filed this action to have my day in Court and to address the Defendant directly.

91.     Simply because he has failed to appear, does not mean that I should be deprived of my opportunity to express to this Court how I was harmed and damaged by the Defendants' actions.

92. In attempt put a numerical value on my damages, my attorneys and I have calculated them as follows:

**Pain, Suffering and Inconvenience**: $257,376.27 (calculated as follows: I charged the Defendant $4K per month for the first 90 days of our agreement; however, my rate was to increase to $7,149.34, after this 90-day period. $7,149.34 * 12 months in a year equals $85,792.09.  Because I was damaged for nearly 3 years, I multiplied that figure by 3 (years) to get the final amount based upon my pain, suffering and inconvenience.

**Emotional Distress**: $548,379.08 (calculated as follows: I suffered for approximately 1,095 days and I am still experiencing the effects of the incident with the Defendant. I multiplied the number of days of my past suffering by $500 per day, my base rate for a consulting call to reach the amount of my emotional distress.

**Past Medicals**: $10,800.00 (calculated as follows: I do not have the official medical bills from Ms. Jackson; however, based upon my approximation of appointments, monies spent, and time provided via our services exchange, I roughly calculate the amount of my medical expenses thus far to equal $10,800.00.

**Future Medicals**: $32,400.00 (calculated as follows: Ms. Jackson advised and I believe that I would be benefited from continued and additional therapy and treatment.  I believe three (3) years of additional

treatment to be reasonable and therefore I took my calculation of past medicals and multiplied it by three (3) for the amount of my future medicals.

**Lost Earnings**: $621,360.27 (calculated as follows: I used the same figure as calculated for my pain, suffering and inconvenience, which incorporated lost wages into its calculation ($257,376.27) and then added my expected commission from the Solbiato deal ($24,000.00), the earnings I expected to receive from the Defendant's teammates as the Defendant advised me that he would get them to retain my services ($53,328.00 per teammate (at a reduced rate)) * 3 teammates equals $159,984.00) and then I added $180,000.00 based upon commissions I expected to reasonably receive from other branding deals with the Defendant. *See* Exhibit "**H**".

**Lost Future Earning Capacity**: $123,852.00 (calculated as follows: I anticipate that I will be blackballed in the sports industry based upon this lawsuit and speaking out against the Defendant.  I conservatively anticipate the effects of any such blackball efforts to last approximately 2.32 years.  2.32 (years) multiplied by my reduced rate per teammate ($53,328.00) produces the above sum.

**Punitive Damages**: $1,000,000.00 (calculated as follows: the total amount of my compensatory damages based upon the above-figures equals $1,595,167.22. The Defendant's actions were malicious and they constitute oppression. The Defendant who is a professional basketball player and who has been one since 2008, and who still is playing professionally overseas, has the means and ability to pay for punitive damages.  Furthermore, the Defendant is estimated to have a net worth between $10 to $14 million dollars and thus he can afford to pay punitive damages. *See* Composite Exhibit "**G**".  Finally, the requested punitive damages are at a ratio of less than 1:1 and therefore they are reasonable and constitutional. In addition, as stated in my motion, I am also seeking an award of my costs and attorneys' fees.

94. I understand that a hearing is discretionary, and I therefore will continue my efforts to gather and

submit supplemental documentation for this Court's review in advance of the hearing on this Motion.

95. I have requested a hearing in good-faith and for both the benefit of this Court and my own as I truly hope to have my day in Court on November 18, 2021.

Under penalty of perjury under the laws of the State of California, I declare that I have read the foregoing Declaration and that the facts stated in it are true and correct to the best of my knowledge and that this declaration was executed this 8th day of October 2021 in Daly City, California.

Shayla Fite (Oct 8, 2021 22:15 PDT)

Shayla Fite

# EXHIBIT

# "A"

## Paris

Sun, Sep 9 2018



( Confirmed )

**KUJV43**          **MBPSJK**

XL Airways          Hopper

**MBPSJK**

 Hopper

**Show All Codes**

---

 **Important Travel Information**

Please review the specific COVID-19 travel requirements set by your airlines and travel destinations.

Face masks may be required for all passengers on this flight.

**More Information**

---

✈ **Los Angeles - Paris** ›

Sun, Sep 9

4:55 pm - 12:40 pm+1d

**Arrives Mon, Sep 10**

 XL Airways

---

☰ **Seats, Bags & Policies** ›

Rules and restrictions about your flight.



# EXHIBIT

# "B"



‹   **Trip Summary**   Help

See CDC Guideline for more info.

✈   **Paris - Los Angeles**   ›
Thu, Sep 27
3:40 pm - 6:00 pm
🇳🇴 Norwegian Air

☰   **Seats, Bags & Policies**   ›
Rules and restrictions about your flight.

👤   **Travelers: 1 Adult**   ›
Shayla

💳   **€332.93 (US$391.81)**   ›
on your card

## Manage My Trip

**Check In & Manage Booking**   ›

**Resend Confirmation Email**   ›

**Get Help**   ›

# EXHIBIT

# "C"

# THE FITE BRAND

## Personal Liaison Service Contract

THIS PERSONAL LIAISON AGREEMENT, effective the __15__ day of
__October__, 20__18__, is entered into by and between THE FITE BRAND, and

__Michael Rawley_____ (Sports Athlete/Entertainer)

THE FITE BRAND and Sports Athlete/Entertainer agree to the following:

1. Rate of pay will be $ __4,000__
   __15th__ for the duration on the contract by check, money order, cash or invoice. per month, due every month on the

2. The duration of this contract is effective <u>today</u> and will end __January 15, 209__.

3. Wages are subject to withholding taxes including income tax and Social Security tax. THE FITE BRAND knowledges its own responsible for taxes occurred for services.

## JOB RESPONSIBILITIES:

A. Provide personal liaison services to client(s)
B. Prepared to be responsible, responsive and available twenty-four hours a day, every day during the length of the contract
C. Tasks may include but are not limited to;
   • arranging travel, visas and accommodation and, occasionally, travelling with the client(s) to take notes or dictation at meetings or to provide general assistance
   • screening phone calls, inquiries and requests, and handling them when appropriate
   • meeting and greeting with colleagues/agents/presidents at all levels of seniority
   • organizing and maintaining diaries and making appointments
   • dealing with incoming email, faxes and post, often corresponding on behalf of the client
   • carrying out Non-Disclosure Agreements and presenting signed documents
   • producing documents, briefing papers, reports and presentations when necessary
   • organize and attend meetings to ensuring the client(s) is well prepared for meetings
   • liaising with client(s), media and other business associates
   • carrying out specific projects like personal shopping, managing household/office, managing fan mail, dinner reservation, car service, etc.

## RELATIONSHIP OF PARTIES:

D. **Contractor Not an Agent, Employee or Servant.** The parties expressly agree that the relationship intended between client and THE FITE BRAND shall be that of an independent contractor only and that this Agreement is not intended to create the relationship of principal and agent, employer and employee, or master and servant.

E. **Worker's Compensation.** No worker's compensation insurance shall be obtained.

F. **Termination of Contract.** Client has the right to terminate contract at any time before the end of the official contract date. However, the remainder balance for the fees owed of the contract are still due in full. Termination must be given in written form.

G. **Refund.** If an employee of THE FITE BRAND deems he/she is unable to participate in a program of their client(s), a full reimbursement for the cost of airfare, care service, hotel etc. will be granted upon proof of receipts.

## SAFE WORK ENVOIRMENT:

H. Services will be provided and received in a safe, courteous, and professional manner.

I. Any physical, sexual, mental or financial abuse will result in immediate termination of this agreement. Instances of abuse will be reported to the Authorities and Law Enforcement.

J. No services may be provided while Participant is a patient in a hospital, acute rehabilitation unit or skilled nursing facility. Client will be reassigned with another employee of THE FITE BRAND.

K. Meals and breaktime are required by Law, any employee of THE FITE BRAND should discuss meals and break times with their client.

## COMMITMENT TO OUR CLIENT(S):

L. We are required to;

- Not misuse Confidential Information in any way
- Maintain the highest standards of probity in all aspects of your life
- be flexible, reliable and discrete and to carry out your duties in a professional manner
- respect our clients home and the privacy of all those living there
- dress appropriately for work tasks and when accompanying client outside of home/office
- not bring children or any other person(s) to work
- not to smoke or do drugs at place of work
- Inform client as soon as possible if not able to come to work and let them know if delayed for more than 10 minutes
- Keep client informed of address and telephone contact details

O. In the course of our employment with our client(s) we will have access to and be entrusted with information relating to health, care needs, finances, private business, family business, relationships with others and the wellbeing which is not within the public domain (together "Confidential Information").We are required to treat all such information as highly confidential both during the term of this contract and at all times thereafter.

## ENTIRE AGREEMENT:

This agreement contains the entire agreement of both parties with respect to the subject matter

this Agreement. In this provision of this Agreement it shall be held valid and enforceable. The employee of THE FITE BRAND and is client(s) do hereby agree to the terms set forth above by their signatures found below.

_____   10/13/18
Signature of Client                                                          Date

_____   10/13/2018
Signature of THE FITE BRAND                                      Date

# EXHIBIT

## "D"

# Fw: Michael Beasley order

📁 Inbox

  **Solbiato DC**                    Oct 29, 2018
To You                                          🚩  •••

Hello Shayla,

Thank you very much for your email and interest in
Solbiato.  We apologize for the delay in response.
We are excited to reconnect with Mr. Beasley as he
was a client and has visited our store before.
We have discussed this among our team and the
only thing we need to proceed would be if Mr.
Beasley would somehow connect with us directly to
confirm you and your firm are representing him.
Thank you again and we are looking forward to
working with you and Mr. Beasley.

Regards,
Shota
Marketing Department

•••

  **You**                            Oct 29, 2018
To Solbiato DC                                      •••



**You**

**To Solbiato DC**

Oct 29, 2018

Hello,

Thank you so much for reconnecting with me. My client and I can give you a call tomorrow to give you verification. Please provide me with the best telephone number to reach the manager or marketing team.

Warm regards,

————

Shayla Fite
Founder of THE FITE BRAND
Sports Branding Agency

📁 Inbox

**Solbiato DC**

**To You**

Oct 29, 2018

Hi Shayla,

Thank you for your quick email.
Please call my colleague, Lou, at (202) 338-4005
tomorrow anytime between 3pm and 8pm Eastern

# COMPOSITE EXHIBIT "E"



**Instacart Support**   Dec 27, 2018

to me ⌄

##- Please type your reply above this line -##

Hi Shayla,

Thank you for your quick response. I understand that you have confirmed to be a Full Service Shopper. I'd be happy to help.

Based on your request, the role you are signing up for with Instacart is now Full Service Shopper.

Since the role you selected has changed, you have a new onboarding process to complete. Please log in to https://shoppers.instacart.com/ to begin.

Heads up on the car questions: please answer those based on the role you are now signing up for:

-

Full Service Shopper - Select Yes on car questions

It's been a pleasure assisting you today. Thank you for choosing Instacart platform. Happy Holidays!

Best,

Xyreen
Instacart Support

*Have other questions? Visit the Instacart Help Center, where you can find resources and information 24 hours a day, seven days a week.*

• • •

**me**   Dec 27, 2018

to Instacart ⌄

# Are you working?  Inbox ☆

**Stefanie Padolina**   May 7, 2019   ↩   •••

to me ⌄

Hi Shayla –

I hope all is well! I just wanted to chat with you about a great opportunity I am working on. Are you available?

Let me know!

**Stefanie Padolina** | Senior Account Manager | ███ ████
110 East 9th Street, Suite 13A | Los Angeles, California 90079 |
www.24seventalent.com
Office: 213.412.2260 | Direct: 213.935.8967



Find us online: Twitter | Facebook | LinkedIn | Instagram

**Missed our 2019 Job Market Report Webinar?** Watch the recording now!
**Check out our open jobs in** Los Angeles.
**It pays to have friends.** Click here to learn more.

---

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy, re-transmit, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail @24seveninc.com, and delete the message. E-mail communication is highly susceptible to

 Application: File Clerk ▶

Inbox

 **Indeed Apply**  May 27, 2019

to me ⌄

indeed

**You submitted an application for:**

✓  [File Clerk](#)
Sonny Properties - Los
Angeles, CA                          **Submitted**

**Follow**  Get job updates from **Sonny Properties**

**More jobs like this**

[Legal Assistant/Filing Clerk](#)
Pilgrim Media Group - Los Angeles, CA

[Temporary Filing Clerk](#)
Goldberg Segalla LLP - Los Angeles, CA

[E-Filing Clerk](#)
On Call Legal - Los Angeles, CA

The following items have been submitted. Good
luck!

- Application
- Resume

 **Application: Administrative Assistant** ➤ [Inbox]   ☆

 **Indeed Apply**   May 27, 2019   ↩   •••
to me ▾



**You submitted an application for:**

✓ [Administrative Assistant](#) **Submitted**
Seven Gables Real Estate -
Los Angeles, CA 90090

[Follow]   Get job updates from **Seven Gables Real Estate**

» **Learn what it's like to work at Seven Gables Real Estate.**

[Read 2 employer reviews](#) ★★★★★

**More jobs like this**

[Administrative Assistant](#)
PCL Construction Services, Inc. - Los Angeles, CA

[Administrative Assistant - Float Pool](#)
UCLA Health - Los Angeles, CA

[Administrative Assistant](#)
Whittier Woods Homeowners Association -
Whittier, CA

#  Indeed Application: Assistant, A&R (Temp) 》 Inbox ☆

**Indeed Apply**  May 27, 2019
to me ⌄



**You submitted an application for:**

✓ **Assistant, A&R (Temp)**
Warner Music Group - Los Angeles, CA      **Submitted**

---

**Follow**   Get job updates from **Warner Music Group**

---

》 **Learn what it's like to work at Warner Music Group.**

Read 144 employer reviews ★★★★☆



**More jobs like this**

**Prior Auth Assistant - Temp**
Regal Medical Group - Northridge, CA

**Floral Assistant**
Cali Bouquet - Manhattan Beach, CA

**Part-Time Performing Arts Assistant, Upper School**
Brentwood School - Los Angeles, CA

**Indeed** Application: Recruiter ⏵

Inbox ☆

Indeed Apply   May 27, 2019
to me ⌄

**indeed**

**You submitted an application for:**



✓ **Recruiter**
On Target Staffing LLC -
Beverly Hills, CA          **Submitted**

---

**Follow**   Get job updates from **On Target Staffing LLC**

---

» **Learn what it's like to work at On Target Staffing LLC.**

Read 79 employer reviews ★★★★★



**More jobs like this**

**Professional Recruiter**
Day & Zimmermann - Culver City, CA

**Hourly Field Recruiter - West Coast**
Sweetgreen - Los Angeles, CA

**Recruiter**
Millennium Space Systems, A Boeing Company - El Segundo, CA

# COMPOSITE EXHIBIT "F"

← Jan 14 - Jan 21 ⌄ ?

‹ **$510.53** ›

$155.29



| 14 Mon | 15 Tue | 16 Wed | 17 Thu | 18 Fri | 19 Sat | 20 Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 27h 49m | 21h 37m | 62 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| Net Fare | **$455.64** |
|----------|-------------|
| Promotions | **$30.00** |
| Other earnings | **$3.89** |
| Tip | **$21.00** |
| Total Earnings | **$510.53** |

SEE EARNINGS ACTIVITY



Jan 21 – Jan 28 ⌄

‹ **$148.62** ›

$60.14

| 21 Mon | 22 Tue | 23 Wed | 24 Thu | 25 Fri | 26 Sat | 27 Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 9h 8m | 6h 42m | 20 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| Net Fare | **$139.67** |
|----------|-------------|
| Promotions | **$6.00** |
| Other earnings | **$0.95** |
| Tip | **$2.00** |
| Total Earnings | **$148.62** |

SEE EARNINGS ACTIVITY



Jan 28 – Feb 4 ⌄

‹ **$625.31** ›

$221.94

|  | 28 Mon | 29 Tue | 30 Wed | 31 Thu | 1 Fri | 2 Sat | 3 Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 29h 16m | 21h 57m | 66 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| Net Fare | **$507.26** |
|----------|-------------|
| Promotions | **$84.50** |
| Other earnings | **$8.55** |
| Tip | **$25.00** |
| Total Earnings | **$625.31** |

SEE EARNINGS ACTIVITY

Feb 4 – Feb 11 ⌄

‹ **$587.43** ›

$156.33



| 4 Mon | 5 Tue | 6 Wed | 7 Thu | 8 Fri | 9 Sat | 10 Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 22h 40m | 19h 6m | 58 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| | |
|---|---|
| Net Fare | **$495.38** |
| Promotions | **$46.00** |
| Other earnings | **$8.55** |
| Tip | **$37.50** |
| Total Earnings | **$587.43** |

SEE EARNINGS ACTIVITY

Case 2:21-cv-03908-FMO-JPR   Document 20-1   Filed 10/08/21   Page 36 of 58   Page ID #:93



Feb 11 – Feb 18

‹ **$593.84** ›

$242.66

| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|----|----|----|----|----|----|----|
| Mon | Tue | Wed | Thu | Fri | Sat | Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 27h 47m | 21h 22m | 67 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| Net Fare | **$472.94** |
|----------|-------------|
| Promotions | **$91.00** |
| Other earnings | **$1.90** |
| Tip | **$28.00** |
| Total Earnings | **$593.84** |

SEE EARNINGS ACTIVITY



←     Feb 18 - Feb 25 ⌄     ?

‹      **$997.31**      ›

$242.66

| 18 Mon | 19 Tue | 20 Wed | 21 Thu | 22 Fri | 23 Sat | 24 Sun |

## Stats

| Online | Active | Trips |
|---|---|---|
| 43h 6m | 34h 37m | 101 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| Net Fare | **$836.51** |
|---|---|
| Promotions | **$116.50** |
| Other earnings | **$13.30** |
| Tip | **$31.00** |
| Total Earnings | **$997.31** |

SEE EARNINGS ACTIVITY



Feb 25 – Mar 4 ⌄

‹ **$0.00** ›

$0.00

| 25 Mon | 26 Tue | 27 Wed | 28 Thu | 1 Fri | 2 Sat | 3 Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 0s | 0s | 0 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

**SEE EARNINGS ACTIVITY**

Case 2:21-cv-03008-FMO-JPR   Document 20-1   Filed 10/08/21   Page 39 of 58   Page ID #:96

# $407.23

$253.89



| 4<br>Mon | 5<br>Tue | 6<br>Wed | 7<br>Thu | 8<br>Fri | 9<br>Sat | 10<br>Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 16h 11m | 14h 9m | 50 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| | |
|---|---|
| Net Fare | **$327.63** |
| Promotions | **$50.00** |
| Other earnings | **$7.60** |
| Tip | **$22.00** |
| Total Earnings | **$407.23** |

SEE EARNINGS ACTIVITY

Mar 11 - Mar 18 ⌄

# $1,257.54

$251.41



| 11 Mon | 12 Tue | 13 Wed | 14 Thu | 15 Fri | 16 Sat | 17 Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 54h 47m | 46h 12m | 138 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| Net Fare | $1,038.33 |
|----------|-----------|
| Promotions | $157.50 |
| Other earnings | $20.11 |
| Tip | $41.60 |
| Total Earnings | $1,257.54 |

SEE EARNINGS ACTIVITY

Case 2:21-cv-02998-FMO-JPR    Document 20-4    Filed 10/08/21    Page 41 of 58    Page ID #:98



Mar 18 — Mar 25

$898.93

$210.25

| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| Mon | Tue | Wed | Thu | Fri | Sat | Sun |

## Stats

Online
**43h 22m**

Active
**34h 45m**

Trips
**113**

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| Net Fare | **$726.60** |
|---|---|
| Promotions | **$107.50** |
| Other earnings | **$9.83** |
| Tip | **$55.00** |
| Total Earnings | **$898.93** |

SEE EARNINGS ACTIVITY

← Mar 25 - Apr 1 ⌄   ?

‹ **$497.30** ›

$181.32



| 25 Mon | 26 Tue | 27 Wed | 28 Thu | 29 Fri | 30 Sat | 31 Sun |

## Stats

| Online | Active | Trips |
|--------|--------|-------|
| 25h 43m | 21h 45m | 68 |

How we calculate stats

How we calculate the Prop 22 earnings guarantee

## Breakdown

| Net Fare | **$464.67** |
|----------|-------------|
| Promotions | **$9.00** |
| Other earnings | **$13.63** |
| Tip | **$10.00** |
| Total Earnings | **$497.30** |

SEE EARNINGS ACTIVITY

# COMPOSITE EXHIBIT

## "G"

# Michael Beasley Net Worth 2021: Age, Height, Weight, Girlfriend, Dating, Bio-Wiki

By **Winnie Muriuki** -  July 13, 2021



*Michael Beasley*

| Celebrated Name: | Michael Beasley |
|---|---|
| **Real Name/Full Name:** | Michael Paul Beasley, Jr. |
| **Gender:** | Male |
| **Age:** | 32 years old |

| Birth Date: | 9 January 1989 |
|---|---|
| Birth Place: | Cheverly, Maryland, United States |
| Nationality: | American |
| Height: | 2.08 m |
| Weight: | 107 kg |
| Sexual Orientation: | Straight |
| Marital Status: | In a relationship |
| Wife/Spouse (Name): | N/A |
| Children/Kids (Son and Daughter): | Yes (Mikaiya, Michael III) |
| Dating/Girlfriend (Name): | Yes (Kaleila Pufolkes) |
| Is Michael Beasley Gay?: | No |
| Profession: | Professional basketball player |
| Salary: | N/A |
| Net Worth in 2021: | $14 million |
| Last Updated: | October 2021 |

Michael Beasley is a popular professional basketball player from America who is regarded as one of the best freshman college basketball players of the 2000s. He played for Kansas State University before getting drafted by Miami Heat in the 2009 NBA draft.

Maybe you know about Michael Beasleyvery well, but do you know how old and tall is he, and what is his net worth in 2021? If you do not know, we have prepared this article about details of Michael Beasley's short biography-wiki, career, professional life, personal life, today's net worth, age, height, weight, and more facts. Well, if you're ready, let's start.

## Early Life & Biography

Michael Paul Beasley Jr. was born on January 9, 1989, in Cheverly, Maryland, to his parents Fatima Smith and Michael Beasley Sr. He has four siblings, including two brothers, Leroy Ellison and Malik Smith, and two younger sisters, Mychaela Beasley and Tiffany Couch.

In 2005, he, along with his family, moved to Frederick and lived there for one year. His mother died of cancer in 2018. Beasley attended a total of six high schools, including Bowie High School in Bowie, Maryland, National Christian Academy in Fort Washington,

Case 2:21-cv-03908-FMO-JPR   Document 20-1   Filed 10/08/21   Page 46 of 58   Page ID
#:103

Maryland, and others.

## Personal Life

Beasley is not married yet, but he is in a live-in relationship with his girlfriend, Kaleila
Pufolkes. Together they are the parents of two beautiful children, Mikaiya and Michael III.
He lives happily with his family in California.

## Age, Height, and Weight

Being born on 9 January 1989, Michael Beasley is 32 years old as of today's date 9th
October 2021. His height is 2.08 m tall, and his weight is 107 kg.

## Career

Michael Beasley started playing basketball when he was in high school for the PG Jaguars
and won multiple national championships. In 2006, he was included in the USA Men's U18
National Team and was also a second-team Parade All-American. The following year, he
was rated number one in the high school basketball prospects.

Later, he started his college career with Kansas State in 2007 and was considered one of
the most dominant players in the country. He had a total of 866 points and was ranked
second among all freshmen in NCAA history. He holds 30 Kansas State career, single-
season records. Beasley is the 27th player in NCAA Division I history to post 26 or more
double-doubles in a single season.

Beasley was the second overall draft by the Miami Heat in the 2008 NBA draft. In his
debut match, he scored 28 points and grabbed nine rebounds. In the preseason game,
Beasley scored 16 points against the Detroit Pistons.

Case 2:21-cv-03908-FMO-JPR   Document 20-1   Filed 10/08/21   Page 47 of 58   Page ID #:104

During the 2009-10 season, he scored a career-high 30 points in a match against Memphis Grizzlies. In 2010, he was traded to the Minnesota Timberwolves. In the same season, he averaged 11.5 points per game.

In 2012, Beasley signed a three-year contract with the Phoenix Suns. However, the following year, he was released by them after Beasley was arrested on suspicion of marijuana possession. In 2013, he returned to Miami Heat and helped his team to reach the NBA finals. He also signed a one-year contract with the Shanghai Sharks of the Chinese Basketball Association.

In 2016, Beasley signed with Shandong Golden Stars after becoming a free agent. He scored 48 points in the opening match of the season. Later, he signed with other teams also including Houston Rockets, Milwaukee Bucks, Milwaukee Bucks, Los Angeles Lakers, and Guangdong Southern Tigers.

## Awards & Achievements

Michael Beasley has won several awards in his illustrious career. He is one of just two players in Kansas State history to earn first-team All-America honors from the Associated Press and the fifth player in school history to earn recognition to any of the organization's three All-America teams.

Beasley was included in the 2008 John R. Wooden Award All American team. At the same time, he won both Big 12 Player of the Year and Freshman of the Year accolades. Beasley was the first player to be named league Freshman of the Year and the twelfth overall to be selected as either Freshman or Newcomer of the Year since 1970.

Beasley was one of the four finalists of the 2008 Naismith Player of the Year Award and Oscar Robertson Player of the Year award.

## Net Worth & Salary of Michael Beasley in 2021



*Michael Beasley Net Worth*

As of October 2021, Michael Beasley has an estimated net worth of more than $14 million. He made this huge wealth through his successful career as a professional basketball player.

He has been a part of several basketball teams of the NBA, including Miami Heat, Houston Rockets, Minnesota Timberwolves, and others. In 2012, he signed an $18 million contract with the Phoenix Suns.

Beasley also makes a huge sum of money through brand endorsements, media appearances, and sponsorships. In addition, he plays for several international tournaments and championships such as the Chineses Basketball Association.

Michael Beasley is considered one of the best basketball players in the world. He started his professional basketball career at a very young age and has appeared in more than ten

NBA seasons until now. He is also very active on various social media platforms, including Instagram, where he has more than 300k followers.



Home    Athletes    Business    Celebrities    Politicians    Articles         Map View    Richest People in the World

Search for a Celebrity...                                             RANDOM

# Michael Beasley Net Worth

in **Richest Athletes** › **NBA Players**



### Michael Beasley Net Worth:
# $10 Million

Michael Beasley net worth: Michael Beasley is an American professional basketball player who has a net worth of $10 million dollars. Michael Beasley was born in Prince George's County, Maryland, and played basketball for the immensely successful youth team the PC Jaguars. He went on to attend six high schools, playing exceptional basketball at all of them.

## Michael Beasley

| | |
|---|---|
| Net Worth: | $10 Million |
| Date of Birth: | Jan 9, 1989 (32 years old) |
| Gender: | Male |
| Height: | 6 ft 9 in (2.08 m) |
| Profession: | Basketball player |
| Nationality: | United States of America |

RELATED ARTICLES

O.J. Mayo Net Worth

His senior year, he was named to the McDonald's All-American team, and won the All-American MVP Award. He was also listed as Rivals.com's No. 1 college recruit in 2007. He went on to attend Kansas State University for one year, where he was quickly recognized as one of the best college players in the country. He became only the second Kansas State University player to earn All-America honors from the Associated Press. He chose to enter the draft after his freshman year, and was selected by the Miami Heat. He was named to the NBA All-Rookie First Team his

Mitch Richmond Net Worth

Dennis Scott Net Worth

Kevin Durant Net Worth

Ronny Turiaf Net Worth

first year with the Heat. He played for the Miami Heat until 2010. He then spent two years with the Minnesota Timberwolves, and one season with the Phoenix Suns. He has had numerous run-ins with the law due to marijuana possession and physical altercations, and is currently without a team.

| A. C. Green Net Worth | Michael Finley Net Worth | Zach LaVine Net Worth |

You May Like   Sponsored Links by Taboola

**Most Affordable Camper Vans**

Camper Van Warehouse | sponsored searches

**These Cars Are So Loaded It's Hard to Believe They're So**

Luxury Cars | Search Ads

**Think Testosterone is the Answer? Mike Tyson Says "Think**

Mike Tyson

**Private Jet Round trip costs from**

Private Jets | Search Ad

**NFL Star Rob Gronkowski's Favorite Shoes**

Wolf & Shepherd

**Have An Old Cat? Top Vet Says To Do This**

Ultimate Pet Nutrition

## MICHAEL BEASLEY EARNINGS



Click to Expand

All net worths are calculated using data drawn from public sources. When provided, we also incorporate private tips and feedback received from the celebrities or their representatives. While we work diligently to ensure that our numbers are as accurate as possible, unless otherwise indicated they are only estimates. We welcome all corrections and feedback using the button below.

Submit a Correction

suggestion and help us fix it!

About Us / Contact Us / Privacy Policy / Accessibility / DMCA / Terms of Use

© 2021 Celebrity Net Worth / All Rights Reserved

Information from your device can be used to personalize your ad experience.
Do not sell my personal information.
AN ELITE CAFEMEDIA PUBLISHER

# EXHIBIT "H"

# Fw: MLTD.com // Michael Beasley

📁 Inbox

 **Eric Flores**
To You

Jan 28, 2019

🚩 ...

📄 **The_Grinds_Deck**
PDF · 4.7 MB

Hi Shayla,

Good to e-meet you! I was referred to you by a colleague of mine at LaCoste. We are an e-commerce online store and currently buy LaCoste, as well as the top brands in the younger men's market:

- Champion
- Adidas
- Vans
- BBC
- Kappa etc etc

We recently started shooting our own original content entitled "The Grinds, with Bobby James". It is a filmed talk show with a host, and is shot on location in Leimert Park at Harun Coffee. This coffee shop is owned by Chace Infinite who manages the

location in Leimert Park at Harun Coffee. This coffee shop is owned by Chace Infinite who manages the ASAP Mob. Our filming crew is Mochilla, who have filmed countless documentaries in the music culture world. Most recently they helmed the YG documentary that came out with his album release, and they also recently shot a doc for Damian Marley. We also have a music industry veteran who partnered with us to oversee the full project.

Our first 4 episode guests have included DJ Quik, Jonathan Mannion (hip hop photographer), Freddie Gibbs and Metta World Peace. We are currently planning out our 5th filming which would be with LA rapper, Problem, and we wanted to inquire about Michael Beasley. I checked the Lakers schedule and it seems that on 2/11 they will not be in town. Let me know if this is of interest to you and Mr. Beasley for future? We would love to have him on the show as a guest.

Every episode also includes our PR blast, which is being sent to approx 40 blogs including Hypebeast, XXL, Complex, WorldStar, LA Leakers etc. MLTD.com will also promote this interview via our 500k+ email list, and via our homepage of the website. We see quite a bit of traffic daily, our top markets include California, New York, Japan and

# Final Declaration

Final Audit Report                                                          2021-10-09

| | |
|---|---|
| Created: | 2021-10-09 |
| By: | Andrew Williams (Andrew@theWilliamsLG.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAjf5lY5jacjBadF2YdVqqPLbhMOJfmkbM |

## "Final Declaration" History

Document created by Andrew Williams (Andrew@theWilliamsLG.com)
2021-10-09 - 5:11:36 AM GMT- IP address: 98.203.132.58

Document emailed to Shayla Fite (shayla@thefitebrand.com) for signature
2021-10-09 - 5:12:06 AM GMT

Email viewed by Shayla Fite (shayla@thefitebrand.com)
2021-10-09 - 5:12:22 AM GMT- IP address: 98.207.7.163

Document e-signed by Shayla Fite (shayla@thefitebrand.com)
Signature Date: 2021-10-09 - 5:15:41 AM GMT - Time Source: server- IP address: 98.207.7.163

Agreement completed.
2021-10-09 - 5:15:41 AM GMT

**Adobe Sign**